## SECURITIES AND EXCHANGE COMMISSION

v.

**Charles W. STEADMAN, et al., Appellants (Two Cases).**

**Nos. 91–5090, 91–5130.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 3, 1992.

Decided June 26, 1992.

Peter J. Nickles, with whom William H. Allen, Coleman S. Hicks, and Elliott Schulder, Washington, D.C., were on the brief, for appellants in 91–5090 and 91–5130.

Martha H. McNeely, Sp. Counsel, S.E.C., with whom James R. Doty, General Counsel, Jacob H. Stillman, Associate Gen. Counsel, and Paul Gonson, Sol., Washington, D.C., were on the brief, for appellee in 91–5090 and 91–5130.

Before: EDWARDS, SILBERMAN, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This is an appeal from the district court's grant of an injunction against appellants for violation of the securities laws. The Securities and Exchange Commission (SEC) brought the action essentially because the Steadman Funds did not register under state Blue Sky laws for 17 years. The SEC claimed that appellants were obliged to disclose to investors that the Funds' non-registration was illegal and to book substantial liabilities for penalties that might accrue as a result. Appellants dispute that they had any duty to book such liabilities or, even if they did, that the liabilities were material. We conclude that appellants were, at most, obliged to include a general footnote in their financial statements disclosing their contingent liabilities. But because they did not act with scienter, we reverse the district court's principal fraud findings (which require scienter) and vacate the injunction.

I.

Charles W. Steadman is chairman, president, and chief executive officer of Steadman Security Corporation (the Corporation), an investment adviser registered with the SEC. The Corporation is contractually responsible for managing the assets and conducting the regulatory affairs of a group of mutual funds known as the Stead-

man Funds. As of 1989, the Funds had approximately 26,000 investors in 50 states and managed roughly $29 million in assets.[1] Although a board of trustees (formerly directors) runs the business of each Fund, each Fund has entered into an investment advisory agreement with the Corporation, pursuant to which the Corporation manages the Fund's investment portfolio and handles its regulatory affairs. The Corporation is owned entirely by the three adult children of Charles Steadman. Mr. Steadman himself is the principal officer of the Corporation and the chairman of the board of trustees and president of each individual Fund.

Prior to 1971, the Steadman Funds operated in a traditional manner. The Funds sold shares through sales offices located throughout the United States, and all Funds were registered under the Blue Sky laws of the states in which their shares were sold. In 1971 the directors of the Funds decided to make a fundamental change in the way most of the Funds did business, closing the various sales offices and selling shares only by mail order from an office in the District of Columbia. The Steadman Funds thus eliminated their sales commissions and became "no-load" mutual funds, which were, at that time, relatively rare. The boards of the various Funds formally ratified this action three years later, in September 1974.

The Funds thereafter allowed their state securities (Blue Sky) registrations to lapse. The boards of directors of the various Funds made a conscious decision to discontinue state registration based upon an opinion letter provided by Carl L. Shipley, an outside attorney. According to testimony by Mr. Steadman and the Corporation's independent auditors, Coopers & Lybrand, who also relied on the Shipley letter in reviewing the Funds' financial statements, the opinion stated without qualification that registration under state Blue Sky laws was unnecessary as long as all sales of shares took place only in the District of Columbia, a jurisdiction which did not require registration. Although a copy of the opinion is unavailable and therefore its precise reasoning cannot be fixed, the record suggests that the opinion was premised primarily on the view that the Due Process Clause of the Fourteenth Amendment to the Constitution would forbid the states from asserting regulatory jurisdiction over securities offerings made through the mail that in-state purchasers had agreed would be deemed to take place in the District of Columbia.[2]

When the Funds switched to doing business by mail order, they accordingly issued an amended prospectus, both to existing and potential investors. This prospectus advised investors that:

> Fund shares are not registered under the local laws of the various states. They are registered under the federal securities laws. The rights of investors are governed exclusively by federal laws and the laws of the District of Columbia and all offers and acceptances are deemed to take place in the District of Columbia.

For the next 17 years, the Funds openly revealed their non-registration under state Blue Sky laws. Every prospectus was filed with the SEC and prominently featured the language quoted above, and each investor who purchased shares in one of the Funds signed an investment application confirming his understanding that "the Fund's shares are registered under the Federal securities laws and not the local laws of the various states." During the 17 years in which the Funds were not registered, the SEC never commented on or criticized ei-

---

1. In the early 1970s, when the conduct that forms the basis of the SEC's lawsuit began, the Funds had net assets of approximately $130 million and 75,000 shareholder accounts.

2. Neither the Funds nor Coopers & Lybrand was able to produce a copy of the letter at trial because it was destroyed during routine file maintenance procedures in earlier years. Two other letters were introduced, however, that tended to corroborate Charles Steadman's and Coopers & Lybrand's recollection of the Shipley letter's contents. Although the district court stated that the evidence of Shipley's advice and appellants' reliance upon it was "scant," *SEC v. Steadman,* Civ. No. 89–2026, *Mem. Op.* at 23, 1991 WL 30794 (D.D.C. Feb. 27, 1991), the district court did not find that the advice was not in fact rendered as the appellants claimed.

ther the non-registration or the nature of the Funds' disclosure of their non-registration. No state securities authority ever asserted a claim under its Blue Sky law, and no individual investor complained.

In 1987, however, the SEC investigated the Steadman Funds' failure to register with the states and concluded that the failure gave rise to several federal securities law violations, including fraud. The Shipley opinion letter, on which the Funds had relied in allowing their state registrations to lapse, turned out to be based on an incorrect reading of the law. In a related context, the Supreme Court had, two decades prior to the Shipley letter, upheld the authority of the states to enforce their Blue Sky laws against out-of-state mail order businesses. *See Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). The SEC determined that 46 states required the registration of mutual fund shares during the period in which the Steadman Funds had not registered, and it charged that the Funds were liable for unpaid fees during that period amounting to between $694,020 and $3,351,409. The Commission also noted that non-registration could subject the Funds to penalties, shareholder rescission suits, and large legal fees. Although non-registration under Blue Sky laws does not in itself violate federal law, the SEC charged the Funds, the Corporation, and Mr. Steadman with federal securities fraud, pricing, and disclosure violations based on what the Commission believed were material misstatements of the Funds' net asset values (NAVs) and net asset values per share that resulted from their failure to book liabilities for the unpaid Blue Sky fees and penalties. The Commission also charged the Steadman Funds with several unrelated technical violations of the securities laws.

Appellants immediately took a number of corrective actions. They brought themselves into compliance with the technical provisions of the securities laws they had been charged with violating. The Funds also retained an attorney to contact the various state securities authorities to inform them of the SEC investigation and the Funds' non-registration and to ask whether they intended to pursue any claims or other enforcement actions against the Funds. After learning of the states' reactions to the inquiries, the Funds booked contingent liabilities of $128,150 and entered into negotiations with state regulators in an effort to settle the claims arising from the Funds' failure to register. Only 25 states demanded payment of penalties, and by the time the trial began, the Funds had succeeded in settling with all but six of them for a total of $100,646.

The district court determined that Steadman, the Corporation, and the Funds had violated various provisions of the federal securities laws. *See SEC v. Steadman*, Civ. No. 89–2026 (D.D.C. Feb. 27, 1991) (*Mem. Op.*). Contrary to the Shipley opinion letter (but not disputed by the Funds), the court observed that the Funds "were subject to the enforcement of state registration laws" and were therefore legally obligated to register with the states even after they became mail order no-load funds. *Id.* at 14. It followed, according to the district court, that the Funds' failure to register gave rise to financial liabilities that the Funds were obliged to disclose. Those reflected the penalties that the states might have levied because of appellants' non-registration. The court accepted the SEC's estimate of the fees the Funds would have paid over the 17 years of non-registration, $694,020, as a proxy for the penalties for which the Funds were liable. *See id.* at 19.

These undisclosed liabilities were held to have been material. The SEC contended, and the court agreed, that the appropriate standard for determining materiality in the mutual fund industry is a penny a share: any liability greater than that, regardless of the share price, is material. $694,000 exceeded a penny a share for the Funds. The district court further held that "[e]ven if ... a minimum was not reasonably estimatable [sic], [appellants] should have discussed potential liabilities in a footnote." *Id.* at 20. The failure to do that was also material, because "[a] reasonable shareholder would find it material that defendants' failure to register under state Blue Sky laws subjected the Funds to large po-

tential liabilities, counting penalties, rescission suits, and legal fees." *Id.* at 20.

The district court concluded that the Funds had acted recklessly in omitting the Blue Sky liabilities from their financial statements and NAV calculations. This was so because the advice in the Shipley opinion letter was "flatly erroneous." *Id.* at 23. The judge thought the Shipley letter was so obviously wrong that Steadman, a graduate of the Harvard Law School with four decades of experience in the mutual fund industry, was "reckless in failing to question [it]." *Id.* at 26. Accordingly, the court held that appellants had committed the more serious forms of securities fraud charged by the SEC, which required that appellants have acted with scienter. It followed that they had also violated the related fraud, disclosure, and pricing provisions that did not require scienter. *See id.* at 26–27. The district court also ruled for the SEC on the unrelated technical violations, which involved the formalities of investment advisory agreements, client account maintenance, and form filings with the SEC. *See id.* at 27–32. The knowing and reckless nature of the appellants' conduct indicated that there was a " 'cognizable danger of recurrent violation,' " *id.* at 33 (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)), thus entitling the SEC to a permanent injunction against future transgressions of the relevant laws. The court stayed its injunction pending appeal, however, noting that the injunction would "result[ ] in a bar to [the defendants'] continued service in the industry," an injury the court termed "irreparable." *SEC v. Steadman,* Civ. No. 89–2026, *Mem.Op.* at 3 (D.D.C. May 1, 1991).

## II.

## A.

■ The premise of the SEC's case is that the Funds had a duty *under federal law* to book liabilities for penalties they might incur from failing to register under state Blue Sky laws. But for the Funds to be held liable under the major anti-fraud provisions of the federal securities laws for failing to book those liabilities, they must have acted with scienter. *See Aaron v. SEC,* 446 U.S. 680, 695, 697, 100 S.Ct. 1945, 1954, 1956, 64 L.Ed.2d 611 (1980); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Supreme Court has made clear that to establish a violation of section 10(b) of the Securities Exchange Act, Rule 10b–5, section 17(a)(1) of the Securities Act, and section 206(1) of the Investment Advisers Act, the SEC must prove that the appellants acted with an "intent to deceive, manipulate, or defraud" when they failed to book liabilities for non-registration under state Blue Sky laws. *Hochfelder,* 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12; *Aaron,* 446 U.S. at 686 n. 5, 100 S.Ct. at 1950 n. 5.[3]

■ Although the Court has left the question open, *see id.,* we have determined, along with a number of other circuits, that extreme recklessness may also satisfy this intent requirement. *See, e.g., Dirks v. SEC,* 681 F.2d 824, 844–45 (D.C.Cir.1982), *rev'd on other grounds,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983); *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d 1434, 1435 (9th Cir.1984) (per curiam); *Warren v. Reserve Fund, Inc.,* 728 F.2d 741, 745 (5th Cir.1984). The kind of recklessness required, however, is not merely a heightened form of ordinary negligence; it is an "extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must

---

**3.** Although the Supreme Court has not held that scienter is required under § 206(1) of the Investment Advisers Act, the language of § 206(1) is identical in all important respects to the language of § 17(a)(1) of the Securities Act, which was central to the Court's holding in *Aaron* that § 17(a)(1) did require scienter. *See* 446 U.S. at 695–97, 100 S.Ct. at 1954–56. We therefore believe that *Aaron* obliges us to interpret § 206(1) the same way and agree with the Fifth Circuit that scienter is required under that section as well. *See Steadman v. SEC,* 603 F.2d 1126, 1134 (5th Cir.1979), *aff'd on other grounds,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981).

have been aware of it." *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir.) (citation omitted), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). In other words, it is "a lesser form of intent." *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977).

■ Here, the Funds were not aware that they were required to register their shares under state Blue Sky laws, because their attorney, in a formal, unqualified opinion letter, told them they did not have to. The Funds were not alone in relying on this opinion.[4] Their disinterested independent auditor, a partner at one of the country's largest accounting firms who had substantial expertise in mutual fund accounting and auditing, also did not question Mr. Shipley's legal advice. We do not think that in failing to book liabilities their attorney had told them were nonexistent, the Funds can reasonably be said to have demonstrated an intent to defraud or a reckless disregard of their legal obligations. There is no evidence that the Funds acted in bad faith in either relying on the opinion letter or in reporting the Funds' NAVs.

The SEC has not suggested that appellants colluded in some way with Mr. Shipley or even that they would have had any motive to do so. The Funds disclosed their non-registration under state Blue Sky laws fully and repeatedly, both to their investors and to the SEC, for 17 years—hardly the sort of behavior one would expect from the perpetrator of securities fraud. Any accusation of bad faith would seem unfounded, because appellants had little, if anything, to gain from discontinuing Blue Sky registration. *See Warren*, 728 F.2d at 746 (declining to find scienter in part because the fund stood to gain nothing from the alleged fraud). At the time of the decision to terminate Blue Sky registration, annual

Blue Sky registration fees for each fund were less than $10,000 per year, a trifle compared to the roughly $130 million the Funds then had under management. These small savings could not have translated into a penny of additional income for any of the appellants unless they materially enhanced the Funds' rates of return and these better returns in turn attracted additional capital into the Funds, thus increasing the asset base on which annual percentage advisory fees were calculated. The SEC has not even alleged that this occurred. If we were to conclude that the appellants meant to defraud investors, we would have to believe that they did so for the sheer joy of it rather than for profit.

The district court's finding of willful fraud is based solely on the evidence that Steadman, although not a practicing lawyer, is a graduate of the Harvard Law School and that he and the directors of the Funds had extensive experience in the securities industry. The district court thought it should have been obvious to such people that the advice they received from Mr. Shipley was wrong. It may well be that Mr. Steadman and the directors were negligent in not inquiring further. Sophisticated professionals like Steadman might be assumed to have come across information (perhaps from competitors) at some point during the 17 years of non-registration that should have put them on notice that the opinion on which they relied might be incorrect. (Appellants have not directed their primary argument against the proposition that they could be thought negligent.) But the evidence does not permit a finding that Steadman or any of the directors actually knew the opinion was wrong or was reckless in relying on it. Steadman, when questioned about the basis of Shipley's opinion, said understandably "I am not a constitutional lawyer." He was actually not any kind of *practicing* lawyer.

---

4. The SEC argues that the appellants failed to carry their burden to establish that Shipley's advice was actually received or relied upon by the boards of directors of the various Funds in 1971, since the boards took no formal action until 1974. The district court, however, referred to the original Shipley letter as "the 1971 letter," which we take to be a finding that the

appellants did in fact receive the letter in 1971. *Mem. Op.* at 5. Given that the change in the Funds' way of doing business, including all the attendant changes to the prospectuses, took place in 1971, we think it frivolous to suggest, based upon the tardy formalities of board approval, that the Funds did not rely on the letter.

We therefore do not think the record will support a determination that appellants acted with the requisite scienter, and we reverse the district court's determination that the appellants violated section 17(a)(1) of the Securities Act, section 10(b) and Rule 10b–5 under the Securities Exchange Act, and section 206(1) of the Investment Advisers Act.

### B.

█ The remaining fraud, pricing, and reporting violations can be predicated on a finding of negligence.[5] Appellants contend that they were not obliged to disclose liabilities of which they were unaware, but under these provisions of the securities laws appellants are liable merely for omitting disclosure of liabilities negligently—in other words, for failing to disclose liabilities about which they *should* have known. *See, e.g., SEC v. American Realty Trust*, 586 F.2d 1001, 1006–07 (4th Cir.1978). That is so, however, only if the omitted disclosures were material. The SEC claims (and the district court accepted) that the minimum liability for appellants' non-registration was $694,000. That figure is material, according to the SEC, because it exceeds a penny a share for each Fund, which the Commission argues is the appropriate standard for materiality in this case—indeed, in any mutual fund case. A penny per share is *per se* material, according to the SEC, because mutual funds are priced and reported in the newspapers to a penny a share.

Under that logic, if a mutual fund had shares priced at $99.54, a liability that would reduce the value of each share to $99.53 would be regarded conclusively as material. But the Supreme Court has held that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important."

*TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Although *TSC* was decided in a slightly different legal context, this appears to be accepted as a general definition of materiality under the federal securities laws. *See, e.g., Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (adopting the *TSC* standard for Rule 10b–5). We cannot imagine that a reasonable investor would think the difference between $99.54 and $99.53 a share important. That mutual funds are priced to the penny may afford convenience to investors—and provide an easy standard for the SEC to use as a benchmark for mutual fund pricing—but it does not conform in all cases to the Supreme Court's definition of materiality. Indeed, Gene Gohlke, the head of the SEC's mutual fund division, did not assert that a penny per share would necessarily affect investment decisions. He also admitted that the SEC would consider allowing a mutual fund with high share prices to round its NAV to the nearest nickel or dime.

█ Even appellants do not dispute, however, that $694,000 in liabilities would be material for at least some of the Funds. Under the materiality standard appellants themselves proposed—5% of the Funds' NAV—$694,000 would qualify. They accordingly contend that their maximum contingent liability was the approximately $100,000 in penalties the states turned out to impose (although six states have not yet closed the case). That figure is below the 5% standard of materiality, as well as the penny-a-share standard.

The SEC's $694,000 computation was an estimate of the minimum penalties arising from non-registration for which the Funds were likely to be liable at the time they discovered that they had been in violation

---

**5.** Sections 17(a)(2) and 17(a)(3) of the Securities Act do not require scienter for their violation. *See Aaron*, 446 U.S. at 701–02, 100 S.Ct. at 1958; *Newcome v. Esrey*, 862 F.2d 1099, 1102 n. 7 (4th Cir.1988) (en banc). Similarly, a violation of § 206(2) of the Investment Advisers Act may rest on a finding of simple negligence. *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237

(1963). It is less clear what state of mind, if any, is required for violation of the mutual fund pricing provisions of § 22(c) of the Investment Company Act and Rule 22c–1, or the disclosure requirements of § 34(b) of the Act, but taking the parties' arguments as we find them, we assume for the purposes of this case that a showing of negligence is also required under these statutes.

of the Blue Sky laws for 17 years. It was calculated by using unpaid Blue Sky fees during that period as a proxy for the expected penalties. The SEC simply took the minimum fee in 1988 for each state requiring registration and charged that to each Fund for each year of non-registration.

We think that figure is so dubious that reliance upon it was clearly erroneous. To begin with, the amount of past unpaid fees is a tenuous basis for estimating future penalties. The record suggests that the amount of unpaid fees is only "one factor" that bears "some relationship" to the size of the penalties a state seeks to assess for non-registration. According to a table prepared by the SEC, the Blue Sky laws themselves do not set penalties according to unpaid fees. Even if unpaid fees were a legitimate basis for estimating liability, simply adding them up ignores what all accounting experts at trial agreed was the touchstone of the inquiry under Financial Accounting Standard No. 5 (FASB No. 5), which governs recognition of contingent liabilities: the probability that a particular penalty will actually be realized. It does not take into account state enforcement practices. The unrebutted evidence indicated that states typically do not assess large penalties against unregistered mutual funds, because such penalties reduce the funds available to blameless shareholders.

Assuming *arguendo* that back fees were an appropriate basis for estimating potential penalties, the $694,000 figure would still be too shaky to rely on, because it is based on a series of incorrect assumptions. The SEC's calculations assumed that in each year since 1971, each Fund sold shares subject to registration requirements in all states. Actually, although data for the period prior to 1983 were unavailable, the post-1983 figures demonstrated that several of the Funds did not sell any shares in a number of states during many years. The SEC also assumed that none of the

Funds was registered in any state after 1971. Some of the Funds were, however, registered in at least some states as late as 1978. The SEC further used 1988 Blue Sky registration fees in performing its calculations for the entire 17-year period, even though uncontradicted testimony indicated that state Blue Sky fees had been lower in earlier years. Finally, the $694,000 figure entirely ignored the effect of state statutes of limitation, which would likely have limited appellants' liability at any given moment to a small subset of the 17-year period during which the Funds were not registered.

The district court's acceptance of the SEC's computation was, accordingly, clearly erroneous. On the other hand, we do not accept appellants' suggestion that the roughly $100,000 for which they eventually settled with most states is an appropriate figure. Appellants may well have made out, in their settlement negotiations, more favorably than reasonably would have been anticipated prior to full disclosure of the problem to the states. And, in any event, when all the settlements are finally reached, the Funds' liability might well exceed the $100,000 by a substantial amount.[6]

We do not see how appellants could have estimated their financial exposure at any point during the 17-year period of non-registration. Prior to settlement discussions, there was no reasonable basis upon which to gauge the states' level of interest in pursuing claims, because one could not be sure, in light of the Funds' consistent disclosure of their non-registration, whether or not the state securities authorities had been aware of the violations. Nor could appellants have known of the individual states' policies concerning financial recoveries from the blameless shareholders of mutual funds. Still less could appellants have estimated the actual size of the likely penalties, since, even had they adopted the SEC's method of using unpaid fees as a

---

6. Of the six states with which appellants have not yet settled, one of them, Virginia, can impose a fine of up to $5,000 for each sale of unregistered shares. And the settlement figures do not take into account the presumably substantial attorney's fees incurred by appellants in connection with litigating and settling these claims. While the Funds' legal fees in the three years prior to becoming embroiled in this difficulty averaged approximately $50,000 per year, their legal fees in 1989 grew to $408,000.

proxy, they lacked the necessary state-by-state sales data for each Fund for many of the years relevant to the calculation.

In this situation, accounting rules did not obligate appellants to attempt to quantify the contingent liability through rough guesses or speculation. FASB No. 5 states that a contingent liability need only be *booked* when it is capable of reasonable estimation. *See* Statement of Financial Accounting Standards No. 5, *Accounting for Contingencies* ¶ 8 (FASB March, 1975). It will be recalled, however, that the district court concluded in its alternative holding that FASB No. 5 required that the Funds disclose in a *footnote* to their financial statements the general nature of the potential liability, as long as there was "a reasonable possibility" that it would be realized. *Id.* ¶ 10 and n. 6.

We think in that respect the district court was correct. The very difficulty of estimating the appellants' liability makes the district court's point. Whatever the ultimate liability turned out to be, or even might have appeared to be at any point during the years of non-disclosure, it seems rather obvious that the risk of material liability was not insubstantial. As the district judge put it, a reasonable investor would have thought the liability important, because "failure to register under state Blue Sky laws subjected the Funds to large potential liabilities, counting penalties, rescission suits, and legal fees." *Mem.Op.* at 20.

■ Appellants' final try at a defense to the non-scienter-based violations is their argument that their open disclosure to investors that they were not registered with the states satisfied their disclosure obligations. According to appellants, once "the basic fact of non-registration was fully disclosed," they were under no further obligation to state that the non-registration was unlawful or to discuss the resulting liabilities; "others were free to evaluate

the lawfulness of that conduct." Appellants' Br. at 31. That argument, if correct, would excuse non-disclosure even if their liability had been both certain and enormous. We are unpersuaded. Appellants' argument assumes investors should themselves have known that appellants' non-registration was illegal.[7] If we were to grant the assumption, we would be obliged to conclude either that the average investor was a good deal more sophisticated than appellants, or that we were wrong in crediting appellants' defense that they did not know their actions were illegal.

### C.

■ The district court's findings of violation pertaining to the maintenance of valid investment advisory agreements, as required by section 15(a) of the Investment Company Act, and to the maintenance and surprise auditing of certain bank accounts for client funds and securities, as provided for in section 206(4) of the Investment Advisers Act and rules 206(4)–2(a)(2)(ii) and (a)(5) thereunder seem amply supported. Section 15(a) states that "[i]t shall be unlawful for any person to serve or act as investment adviser of a registered investment company, except pursuant to a written contract." 15 U.S.C. § 80a–15(a). Such a contract must be approved initially by the shareholders of the investment company and may remain in force for a period of two years. After that, annual approval by either the board of directors of the company or by its shareholders is required in order for the agreement to remain in force. *Id.* It is undisputed that the investment advisory agreement pursuant to which the Corporation acted as investment adviser to the Funds lapsed in November of 1985 without receiving the necessary approval. The only question is whether a new investment advisory contract was validly in force after that date. The answer

7. None of the cases relied on by appellants permits a defendant to disclose that he is pursuing an unlawful course of conduct without also disclosing that it may be unlawful and discussing the potential liability. *See Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1323 (7th Cir.1988); *Gaines v. Haughton,* 645 F.2d 761, 779 (9th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982); *Billard v. Rockwell Int'l Corp.,* 526 F.Supp. 218, 221 (S.D.N.Y.1981), *aff'd,* 683 F.2d 51 (2d Cir.1982).

to this question depends on what it means to have a "written contract." The shareholders of the various Funds approved a new investment advisory agreement during 1984, but the agreement thus authorized was apparently never executed.[8] The Corporation contends that authorization was enough, but we do not agree. A valid written contract within the meaning of the statute must be both authorized and executed, so that it clearly binds the investment adviser; to permit ambiguity concerning the force and effect of the agreement would undermine Congress' purpose, evident from the face of the statute, of creating certain and stable relationships between investment advisers and the companies they advise. Accordingly, we affirm the judgment of the district court that the Corporation violated section 15(a) during the period in which it operated without a validly executed investment advisory agreement.

■ We also affirm the district court's findings with respect to appellants' improper maintenance of special bank accounts to handle the Funds' money. Rules 206(4)–2(a)(2)(ii) and (a)(5) provide that "any investment adviser who has custody or possession of any funds or securities in which any client has any beneficial interest" may not "do any act or take any action ... with respect to any such funds or securities" unless the investment adviser keeps separate bank accounts that contain only client funds and "are maintained in the name of the investment adviser as agent or trustee for such clients." 17 C.F.R. § 275.206(4)–2(a)(2)(ii). All funds and securities kept in such accounts must be audited by an independent accountant at least once a year at a time of the accountant's choosing without prior notice to the investment adviser. *See id.* § 275.206(4)–2(a)(5). The Corporation acts as transfer agent for the Funds, and in that capacity, it maintains two accounts that the district court found were not in compliance with these provisions: a sub-

scription account, into which the Corporation deposits the funds of investors who wish to purchase shares, and a redemption account, into which the Corporation takes money that the Funds owe to investors when they redeem their shares. In both cases, the Corporation holds the money involved for only a very short time prior to transferring it to the Funds or to the investors, as the case may be.

The Corporation admits that its subscription and redemption accounts were not maintained in the name of the Corporation as agent of the Funds, as Rule (a)(2)(ii) requires. *See* Answer ¶ 53. The Corporation also does not contest the district court's finding that prior to 1990, the Corporation did not arrange for the annual surprise audits required by Rule (a)(5). It nonetheless challenges the district court's findings of violation on two grounds. First, the Corporation argues that these rules were intended to apply only to an investment adviser acting as a custodian for an investment company, and not to one acting as a transfer agent. The language of the regulation suggests otherwise, however, because the regulation explicitly applies to any investment adviser with "custody *or possession*" of client funds. This reading of the regulation is confirmed by the exemption in 17 C.F.R. § 275.206(4)–2(b) for investment advisers who are also registered broker-dealers. The drafters of the regulation clearly understood that investment advisers might wear several different hats and be subject to several different sets of regulations; had they wished to exempt investment advisers acting as transfer agents from the bank account and audit rules, they would have done so.

■ The Corporation's second line of attack is, by now, familiar. The Corporation argues that it cannot be held liable for failing to organize surprise audits of its subscription and redemption accounts, because the regulation mandating such audits

---

**8.** The district court found that "defendants failed to demonstrate that any new investment advisory agreement was executed in 1984 pursuant the shareholders' approval." *Mem.Op.* at 28. The Corporation argues on appeal that its annu-

al reports after 1984 stated that the new agreement was in effect. This single piece of evidence is not enough, however, to render the district court's factual finding clearly erroneous.

requires a showing of scienter to establish a violation. This is so, according to appellants, because the statute upon which the regulation is based itself requires scienter to make out a violation. *See Hochfelder,* 425 U.S. at 214, 96 S.Ct. at 1391. Section 206(4) of the Investment Advisers Act prohibits an investment adviser from "engag[ing] in any act, practice, or course of business which is *fraudulent, deceptive,* or *manipulative*" (emphasis added).

This argument would have merit if the wording of section 206(4) were akin to the language of section 17(a)(1) of the Securities Act, which the Court in *Aaron* did hold required a showing of scienter. The language of section 206(4), however, appears to resemble more closely the language of section 17(a)(3), which the Court held did *not* require such a showing. Although it uses the adjectives "fraudulent, deceptive, or manipulative," section 206(4) does not speak in terms of the "device, scheme, or artifice" that the *Aaron* Court believed connoted so strongly a knowledge or intent requirement. *See* 446 U.S. at 696, 100 S.Ct. at 1955. Rather, section 206(4) uses the more neutral "act, practice, or course or business" language. This is similar to section 17(a)(3)'s "transaction, practice, or course of business," which "quite plainly focuses upon the *effect* of particular conduct . . . rather than upon the culpability of the person responsible." *Id.* at 697, 100 S.Ct. at 1956 (emphasis in original). Accordingly, scienter is not required under section 206(4), and the SEC did not have to prove it in order to establish the appellants' liability under the account maintenance and auditing regulations.

██ Mr. Steadman makes one last meritorious challenge, however. He contests the district court's determination that he was properly held personally liable for aiding and abetting the Corporation's violation of the aforementioned regulations. To be liable as an aider and abettor, a person must "knowingly and substantially assist[ ]" in the commission of a securities law violation, with at least "a general awareness that his role was part of an overall activity that was improper." *Inves-*

*tors Research Corp. v. SEC,* 628 F.2d 168, 178 (D.C.Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980). The district court relied on Mr. Steadman's statement that he possessed "ultimate supervisory responsibility" over the Corporation to satisfy this test. *See Mem.Op.* at 27. However important that admission may be to a finding of liability based on *respondeat superior,* it is completely beside the point when the question is aiding and abetting. The SEC has not pointed to a single piece of evidence that tends to show that Mr. Steadman was generally aware that the Corporation's subscription and redemption accounts were being managed improperly or that surprise audits were required. Mr. Steadman, therefore, may not be held liable for aiding and abetting those violations.

\* \* \* \* \* \*

██ The charges in this case fall into three distinct categories. Both parties agree that the claims of willful or reckless securities fraud were at the core of the SEC's case. The negligent fraud charges and the alleged pricing and disclosure violations were next in order of seriousness. Least serious were the technical violations of the advisory agreement and account maintenance rules, and the reporting violations the appellants did not appeal. The district court found that the appellants had committed all three categories of offenses and accordingly issued a permanent injunction against them. We have set aside the findings of violation in the most serious category, and, as to the second, have rejected the SEC's principal contention that the Funds had a duty to book a large liability. We have affirmed the district court on this second category based only on the presumably negligent omission of a footnote in appellants' financial statements. In light of our disposition, an injunction is no longer justified.

" 'The ultimate test' " of whether an injunction should issue " 'is whether the defendant's past conduct indicates . . . that there is a *reasonable likelihood* of further violation[s] in the future.' " *SEC v. Savoy Indus.,* 587 F.2d 1149, 1168 (D.C.Cir.1978) (quoting *SEC v. Commonwealth Chem.*

*Securities, Inc.,* 574 F.2d 90, 99–100 (2d Cir.1978)) (emphasis in original), *cert. denied,* 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979). There must be "some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). The relevant factors we consider when assessing the likelihood of recurrent violation include "whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future." *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1228 (D.C.Cir.1989). Injunctive relief is reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger to the investing public.

Appellants' business certainly presents them with opportunities to violate the securities laws in the future, and because they have violated the securities laws in the past, *see Steadman v. SEC,* 603 F.2d 1126 (5th Cir.1979), *aff'd on other grounds,* 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981), some concern over future violations is not irrational. Nonetheless, the violations committed by the appellants in this case do not provide an adequate predicate for granting an injunction. None of these violations was flagrant or deliberate, and most were "merely technical in nature." They were corrected immediately after the SEC notified the appellants that charges were pending. Good faith reliance on the advice of counsel is also a factor in determining the propriety of injunctive relief.[9] *See, e.g., SEC v. Goldfield Deep Mines Co.,* 758 F.2d 459, 467 (9th Cir.1985); *SEC v. Savoy Indus.,* 665 F.2d 1310, 1314 n. 28 (D.C.Cir. 1981); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1101 (2d Cir.1972). As we noted previously, there has been no suggestion that the appellants did not act in good faith when they ceased state registration and prepared their financial state-

ments in reliance on the advice they received from Mr. Shipley. At most, appellants were negligent in failing to add a single footnote about potential liability under the Blue Sky laws. A permanent injunction is " 'a drastic remedy' and should not be granted lightly, especially when the conduct has ceased." 1 T. HAZEN, THE LAW OF SECURITIES REGULATION § 9.5, at 400 (2d ed. 1990). Because we find no reasonable basis from which to conclude that the appellants are likely to violate the securities laws in the future, we vacate the permanent injunction.

*It is so ordered.*

---

**9.** It may not, however, constitute a complete defense to the underlying charges. We express

no opinion on that subject.