# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 18, 2007         Decided January 11, 2008

No. 06-1319

DOLPHIN AND BRADBURY, INCORPORATED AND
ROBERT J. BRADBURY,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of the
Securities and Exchange Commission

*Philip G. Kircher* argued the cause and filed the briefs for petitioners.

*Rada Lynn Potts*, Senior Litigation Counsel, Securities & Exchange Commission, argued the cause for respondent. With her on the brief were *Brian G. Cartwright*, General Counsel, *Andrew N. Vollmer*, Deputy General Counsel, and *Jacob H. Stillman*, Solicitor.

Before: GINSBURG, *Chief Judge*, and BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Dolphin & Bradbury, Inc. and Robert J. Bradbury petition for review of a Securities and Exchange Commission order holding them liable for violations of multiple securities laws. Petitioners claim they lacked the requisite intent. We disagree and deny the petition for review.

I

Petitioner Dolphin & Bradbury, Inc., a registered broker-dealer, served as underwriter for the municipal bonds issued by the Dauphin County General Authority (DCGA) to finance the purchase of Forum Place, an office building in Harrisburg, Pennsylvania. Petitioner Robert J. Bradbury is the chairman, chief executive officer, chief operating officer, and 38% owner of Dolphin & Bradbury.[1]

When the bonds were offered in July 1998, the Pennsylvania Department of Transportation (PennDOT) occupied a substantial portion of Forum Place.[2] PennDOT's lease was scheduled to (and did) expire in November 2001—well before the bonds' maturity dates, which ranged from 2003 to 2025. PennDOT leased this space because of environmental problems and fire damage to its own building, but planned to move once its building was renovated or replaced. Bradbury believed the move would probably occur around 2001 or 2002.[3] The key

---

[1] For convenience, we refer to the petitioners collectively as "Bradbury."

[2] The Pennsylvania Department of General Services formally held the lease, but PennDOT occupied the office space. We thus refer to the lease as "PennDOT's lease."

[3] We refer to PennDOT's planned departure—the key fact in this case—as "the PennDOT information."

participants—Bradbury (underwriter), O'Neill (underwriter's counsel), Fowler (DCGA's financial advisor), and Sweet (DCGA's bond counsel)—all had extensive municipal bond experience, and all except O'Neill knew the PennDOT information.

On June 30, 1998, in the run-up to the bond offering, the Secretary of the Department of General Services told Fowler and Sweet he expected the state government to use Forum Place as temporary "swing space" for other state employees after PennDOT moved, but he made no commitments or guarantees. Fowler and Sweet informed Bradbury. On July 8, 1998, DCGA voted to proceed with the bond offering and Forum Place acquisition. PennDOT's plans were discussed at this DCGA meeting, which Bradbury did not attend.

Despite the critical importance of PennDOT's planned departure, Bradbury generally failed to disclose this information to prospective investors.[4] Instead, he attempted to assure them about Forum Place's future by referring to the state government's swing space needs. The Official Statement—the key disclosure document—included some disclaimers and cautionary language, but it did not disclose that PennDOT *actually planned* to leave Forum Place. Moreover, financial projections prepared by Fowler, reviewed by Bradbury, and provided to investors assumed the Forum Place leases would continue at the same lease rates until at least 2008.

When the Forum Place transaction closed on July 31, 1998, PennDOT's old building had not been demolished and site

---

[4] Putnam Investments, the only investor to whom Bradbury disclosed the PennDOT information, still purchased almost $27 million of bonds. The Commission imposed no liability for bonds sold to Putnam.

preparation for the new building had not yet begun. However, just one day later, PennDOT's old building was imploded. Construction began on the new PennDOT building. In late 2000, PennDOT vacated most of its Forum Place space, but continued to pay rent until its lease expired in November 2001. By December, 55% of Forum Place lay vacant, and bondholders forced Forum Place into receivership in 2003.

The ALJ and the Commission found Bradbury violated various securities laws and regulations by failing to disclose the central fact of PennDOT's planned departure. Bradbury challenges the Commission's finding that he acted with scienter.

II

A

The Commission found Bradbury violated section 17(a) of the Securities Act of 1933 (Securities Act), 15 U.S.C. § 77q(a), as well as section 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. We have subject matter jurisdiction to review the Commission's order pursuant to a "direct-review statute," namely, section 9 of the Securities Act and section 25 of the Exchange Act. *See Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (discussing 15 U.S.C. §§ 77i(a), 78y(a)(1)).

"The antifraud provisions of the federal securities laws prohibit fraudulent or deceptive practices in the offer and sale of municipal securities." *Disclosure Obligations*, Securities Act Release No. 7049, Exchange Act Release No. 33,741, 56 SEC Docket 479 (Mar. 9, 1994), 1994 WL 73628, at *5. Rule 10b-5 renders it unlawful for someone in Bradbury's position "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. In this context, an omitted fact is material if a "reasonable investor" would have viewed it as "significantly alter[ing] the total mix of information made available." *Disclosure Obligations*, 1994 WL 73628, at *5 (brackets omitted) (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

Bradbury only disputes whether he acted with scienter, *see SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992), which is a factual determination.[5] *See Howard v. SEC*, 376 F.3d 1136, 1149 (D.C. Cir. 2004); *Graham v. SEC*, 222 F.3d 994, 1005 (D.C. Cir. 2000). Section 17(a)(1) of the Securities Act, section 10(b) of the Exchange Act, and Rule 10b-5 require proof of scienter. *See Aaron v. SEC*, 446 U.S. 680, 697 (1980); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

To prove Bradbury acted with scienter, the SEC must establish "'an intent to deceive, manipulate, or defraud.'" *Steadman*, 967 F.2d at 641 (quoting *Aaron*, 446 U.S. at 686 n.5). "[E]xtreme recklessness" can satisfy this scienter requirement. *Id.* Extreme recklessness "is not merely a heightened form of ordinary negligence," *id.*, and does not involve a "should have known" standard, *see id.* at 641–42. Rather, "it is an 'extreme departure from the standards of ordinary care . . . which presents *a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it*.'" *Id.* (emphasis added) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)). It is,

---

[5] The Commission properly found that both petitioners violated Municipal Securities Rulemaking Board Rule G-17; that Dolphin & Bradbury violated section 15B(c)(1) of the Exchange Act, 15 U.S.C. § 78o-4(c)(1); and that Robert Bradbury aided and abetted Dolphin & Bradbury's section 15B(c)(1) violation.

in fact, "'a lesser form of intent,'" *id.* at 642, implying the danger was so obvious that the actor was aware of it and consciously disregarded it.

The Commission's finding that Bradbury acted with scienter is conclusive if, under our "very deferential" substantial evidence standard, *Nat'l Ass'n of Sec. Dealers v. SEC*, 801 F.2d 1415, 1419 (D.C. Cir. 1986), "a reasonable mind might accept [the] evidentiary record as adequate to support [the Commission's] conclusion," *Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (quotation marks omitted). *See Graham*, 222 F.3d at 999 (citing 15 U.S.C. § 78y(a)(4)). Because the notion of extreme recklessness "belies the existence of a bright line test for when the scienter threshold has been crossed," 3 THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION § 12.8[3] (5th ed. 2005), this case requires a fact-intensive inquiry.

## B

Bradbury contends the Commission's scienter finding is not supported by substantial evidence. We disagree. First, Bradbury did not disclose PennDOT's actual plans to move out of Forum Place. Second, he tries to hide his extreme recklessness by misstating the role of an underwriter. We address each point in turn.

### (1)

PennDOT's lease was crucial because PennDOT occupied 79% of Forum Place and generated 60% of its lease revenues,[6] and the bonds' tax-exempt status depended on continuing

---

[6] Forum Place's revenues were the sole source of bond repayment funds.

occupancy by public agencies such as PennDOT. Bradbury claims he adequately disclosed the risks of PennDOT leaving Forum Place. He points to cautionary statements in the offering documents to show he did not act recklessly. Most significantly, the Official Statement warned, in boldface capital letters: "The office leases are scheduled to expire prior to the maturity of the 1998 bonds; there is no commitment, requirement, or guarantee that the Commonwealth [of Pennsylvania] will renew or extend any of the office leases." It also disclosed the square footage and lease rate of the PennDOT lease and explained "[t]he 1998 Bonds are limited obligations of the Authority and are secured by and payable solely from the revenues derived from lease payments and [facilities] fees."[7]

But substantial evidence supports the Commission's conclusion that Bradbury's cautionary statements were so deficient he must have known investors would be misled by the offering documents. The Commission noted the critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge the event *will* occur. Bradbury's cautionary language only disclosed a *risk* that tenants *might* leave Forum Place—not his knowledge that PennDOT *actually planned* to do so in the near future. Bradbury also argues his discussions with investors about the state government's swing space needs show he did not act with scienter. However, this argument again misses the point: discussing swing space only implies that a tenant *might* leave Forum Place—not that the largest tenant *actually* had plans to leave.

Bradbury's "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk" had

---

[7] Bradbury's counsel (O'Neill) prepared the Official Statement; Bradbury used it to market the bonds.

already "transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004). Bradbury in effect asks us to apply the scienter standard in a way that would protect "'someone who warns his hiking companion to walk slowly because there *might* be a ditch ahead when he *knows* with near certainty that the Grand Canyon lies one foot away.'" *See id.* (emphases added) (quoting *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)). We refuse to do so, especially since Bradbury's role as an underwriter is really that of a trail guide—not a mere hiking companion.

The manifest danger of misleading investors is underscored by the *enormous significance* of PennDOT's planned departure and the *near certainty* with which Bradbury knew the departure would occur. Here, Bradbury knew PennDOT would leave Forum Place once its new building was completed. Furthermore, the PennDOT information had enormous significance because it dramatically affected the tax-exempt status of the bonds and put the bonds' repayment at risk. PennDOT's planned departure was an unusually important piece of information, and Bradbury "is an experienced professional who has an independent duty to use diligence 'where there are any unusual factors.'" *See Graham*, 222 F.3d at 1005 (quoting Commission decisions).

The financial projections Bradbury used to market the bonds were flawed because they assumed the PennDOT lease would continue (or that PennDOT would be replaced by a similar tenant) through 2008. The projections were so deeply flawed that Bradbury must have been aware they would mislead investors. *See Eisenberg v. Gagnon*, 766 F.2d 770, 775–76 (3d Cir. 1985) (concluding that financial projections are actionable under Exchange Act section 10(b) and Rule 10b-5 and explaining that "[w]hen a representation is made by professionals or those with greater access to information or

having a special relationship to investors making use of the information, there is an obligation to disclose data indicating that the opinion or forecast may be doubtful"). Because Bradbury could not have had a genuine belief in the projections' completeness and accuracy, his use of them to market the bonds supports the Commission's scienter finding.

Bradbury offers two additional reasons that his disclosures show he did not act with scienter. We reject them both. First, Bradbury maintains he knew PennDOT planned to depart, but did not know precisely when. However, Bradbury's lack of perfect knowledge did not relieve him of his duty to disclose those material facts he did know. Second, Bradbury notes the PennDOT information was technically in the public domain, partly due to a local newspaper article and a discussion at a public DCGA meeting. But substantial evidence supports the Commission's finding that Bradbury still had a duty to disclose the PennDOT information, because this information was not reasonably available to investors. *See United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) ("[S]poradic news reports do[] not give . . . sufficient notice . . . .").

(2)

Bradbury attempts to paint his state of mind in a favorable light by simultaneously understating and overstating his role as an underwriter. On the one hand, Bradbury *understates*—and nearly abdicates—his independent responsibilities, arguing he escapes liability because nobody told him to disclose the PennDOT information. On the other hand, he *overstates* his role in the process by arrogating the role of an investor in evaluating material facts and weighing expected risks. We reject both of these attempts to mischaracterize an underwriter's role.

An underwriter "occupies a vital position" in a securities offering because investors rely on its reputation, integrity, independence, and expertise. *Municipal Securities Disclosure*, Exchange Act Release No. 26,100, 41 SEC Docket 1131 (Sept. 22, 1988), 1988 WL 999989, at *6, *20–21. "By participating in an offering, an underwriter makes an implied recommendation about the securities [that it] . . . has a reasonable basis for belief in the truthfulness and *completeness* of the key representations made in any disclosure documents used in the offerings." *Id.* at *20 (emphasis added); *see, e.g.*, *Hanly v. SEC*, 415 F.2d 589, 596 (2d Cir. 1969) ("A securities dealer occupies a special relationship to a buyer of securities in that by his position he implicitly represents he has an adequate basis for the opinions he renders."); *Disclosure Obligations*, 1994 WL 73628, at *17.

An underwriter must investigate and disclose material facts that are known or "reasonably ascertainable." *Municipal Securities Disclosure*, 1988 WL 999989, at *20 (quoting *Hanly*, 415 F.2d at 597); *cf. SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 858 (9th Cir. 2001) (holding an underwriter "had a duty to make an investigation that would provide him with a reasonable basis for a belief that the key representations in the statements . . . were truthful and complete"). Although other broker-dealers may have the same responsibilities in certain contexts, underwriters have a "heightened obligation" to ensure adequate disclosure. *Municipal Securities Disclosure*, 1988 WL 999989, at *21 & n.74. Moreover, these duties do not disappear simply because "customers may be sophisticated and knowledgeable." *See Hanly*, 415 F.2d at 596. Indeed, the doctrine of *caveat emptor* has little application in this context. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963).

Bradbury claims his reliance on his counsel (O'Neill), DCGA's bond counsel (Sweet) and financial advisor (Fowler),

and the silence of investors negates any scienter finding. He assumed others would raise any disclosure issues with him. Substantial evidence supports the Commission's conclusion that Bradbury cannot rely on the silence of others to absolve himself of responsibility when non-disclosure presented such an obvious danger of misleading investors.[8]

First, Bradbury failed to disclose the PennDOT information to O'Neill, who lacked independent knowledge of this information. Although reliance on counsel is "a relevant consideration in evaluating a defendant's scienter," *Howard v. SEC*, 376 F.3d 1136, 1147 (D.C. Cir. 2004), Bradbury's failure to disclose PennDOT's plans to O'Neill substantially undercuts his argument. *See* Douglas W. Hawes & Thomas J. Sherrard, *Reliance on Advice of Counsel as a Defense in Corporate and Securities Cases*, 62 VA. L. REV. 1, 29 (1976) ("Reliance on advice of counsel will not be available to the defendant if he failed to disclose all relevant facts to the attorney."); *United States v. Fin. Comm. to Re-Elect the President*, 507 F.2d 1194, 1198 (D.C. Cir. 1974) (similar principle in the criminal context); *cf. Municipal Securities Disclosure*, 1988 WL 999989, at *24 (reliance on others "whose duties have given them knowledge of particular facts" affects the reasonableness of an underwriter's belief). Moreover, Bradbury's reliance-on-counsel argument is much weaker than the one in *SEC v. Steadman*, a case in which defendants failed to register securities because their attorney formally and unqualifiedly told them they need not do so. *See Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992).

---

[8] Although not cited by the Commission, Bradbury's own expert acknowledged an underwriter "cannot delegate" his responsibilities to others.

Second, Bradbury blindly relied on DCGA's financial advisor (Fowler) and bond counsel (Sweet). Yet an underwriter may not "blindly" rely on information provided by the issuer. *Hanly*, 415 F.2d at 597; *see Municipal Securities Disclosure*, 1988 WL 999989, at \*25 ("Sole reliance on the representations of the issuer would not suffice."). Bradbury tries to shift blame to Fowler's incomplete financial projections, but the obviously faulty assumptions underlying those projections left Bradbury's duties to investigate and disclose intact. *See id.* at \*26 & n.92. Bradbury also claims he relied on an opinion letter drafted by Sweet, but the Commission reasonably rejected this argument. Sweet's opinion letter did not even approve the most relevant cautionary language in the Official Statement.

Third, Bradbury also understates his role by relying on investors' silence. He asserts he would have disclosed the PennDOT information to investors if they had only asked him the right questions. This may be true. However, underwriters have a "heightened obligation" to ensure adequate disclosure—not just to answer questions when an investor has the perceptiveness and ambition to identify an important undisclosed issue and doggedly pursue it.[9] *See id.* at \*21 & n.74.

We reject Bradbury's attempts to negate his scienter by understating his role—especially given the patently obvious danger of not disclosing the PennDOT information. It certainly would have bolstered the Commission's scienter finding if Bradbury had ignored explicit warnings from other key players

---

[9] The alleged mismanagement of Forum Place following the bond offering is irrelevant to our scienter inquiry; taking this into account would improperly rely on "the blazing light of hindsight." *See Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 n.19 (7th Cir. 1977).

in the bond offering. In the end, however, we conclude a "reasonable mind might accept" the Commission's rejection of Bradbury's reliance arguments. *See Dickinson v. Zurko*, 527 U.S. 150, 162 (1999) (describing the substantial evidence test).

At the same time Bradbury understates his role in certain respects, he also overstates it by arrogating the role of an investor in evaluating material facts and weighing expected risks. Each *investor* must have the opportunity to make decisions based on a singular (and perhaps idiosyncratic) preference for balancing risk and return, taking into account its unique investment portfolio. Bradbury's role was to facilitate each investor's individualized balancing of risk and return—not to strike the balance on his own without revealing a critically important fact.

Because of the state government's vaguely expressed intention to use Forum Place as swing space, Bradbury decided PennDOT's departure plans should not affect investors' bond purchasing decisions. Thus, he contends discussing swing space issues with investors obviated the need to disclose PennDOT's departure plans. This misconceives an underwriter's role. As the standard for materiality makes clear, "*investor[s]*" must have the opportunity to assess the "'total mix' of information." *See TSC Indus. v. Northway, Inc.,* 426 U.S. 438, 449 (1976) (emphasis added). Moreover, the offering documents should have "accurately reflect[ed] all material facts which a prudent *investor* should know"—not material facts Bradbury personally found to be dispositive. *See Municipal Securities Disclosure*, 1988 WL 999989, at *22 n.76 (emphasis added). Accordingly, Bradbury should have disclosed both PennDOT's departure plans and the state government's swing space needs. Then, prospective investors could have made fully informed decisions.

Putnam Investments purchased $27 million in bonds, even after being fully informed. Bradbury argues this shows the danger of non-disclosure was not obvious. The Commission rejected his argument. We do too. First, Bradbury only disclosed the PennDOT information to Putnam because Putnam's analyst persisted until she got answers. The very fact that Putnam was intent on finding out this type of information actually undercuts Bradbury's argument; it shows Bradbury "must have known" the information was important to investors. Second, Putnam's purchase does not mean the PennDOT information was not essential. Indeed, Putnam's analyst considered the information "critical" and other investors labeled it "very material" and "very critical." Third, Bradbury's argument ignores the fact that different investors make very different decisions. For example, Putnam might have strongly desired tax-exempt bonds, while others might have been very averse to significant bond-repayment risk.

For the foregoing reasons, we hold substantial evidence supports the Commission's finding that Bradbury acted with scienter.

## III

Were we writing on a blank slate, this would be a very close case, because the scienter threshold is high. But we need not decide how to sketch the contours of extreme recklessness on a blank slate, because Congress has directed us to uphold the Commission's factual findings if supported by substantial evidence. *See* 15 U.S.C. §§ 77i(a), 78y(a)(4). And, when viewed through that deferential lens, we conclude a "reasonable mind might accept" the evidence as "adequate" to support the Commission's scienter finding. *See Dickinson*, 527 U.S. at 162. Substantial evidence supports the Commission's finding that Bradbury's non-disclosure created a danger of misleading

buyers that was so obvious he *must* have known about it. Accordingly, we deny the petition for review and affirm the Commission's order.

*So ordered.*