# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 16, 2006　　　　Decided February 6, 2007

No. 05-5433

SECURITIES AND EXCHANGE COMMISSION,
APPELLEE

v.

WASHINGTON INVESTMENT NETWORK AND
ROBERT RADANO,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 02cv01506)

*Russell G. Ryan* argued the cause for appellants. With him on the briefs was *Bradley H. Cohen*.

*Mark R. Pennington*, Assistant General Counsel, Securities & Exchange Commission, argued the cause for appellee. With him on the brief were *Brian G. Cartwright*, General Counsel, and *Jacob H. Stillman*, Solicitor.

Before: GINSBURG, *Chief Judge*, and TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*:  Appellants ask us to reverse the district court's finding that appellant Washington Investment Network ("WIN") violated sections 203(f), 206(1), and 206(2) of the Investment Advisers Act of 1940 (the "Act"), 15 U.S.C. §§ 80b-3(f), 80b-6(1), and 80b-6(2), and that appellant Robert Radano aided and abetted those violations.  Appellants also seek to vacate the district court's injunction and reverse the imposition of penalties.  Because the district court's factual findings are not clearly erroneous, and because we find no error of law, we uphold the district court's finding of violations.  We remand the case to the district court so it may craft a more narrow injunction.  Appellants have forfeited their objection to the imposition of penalties.

I

This case revolves around the business dealings of Steven Bolla, Robert Radano, and their company, Washington Investment Network (WIN).  WIN was, at relevant times, a registered investment advisor.  Bolla was not actually a legal owner of WIN—rather, Radano and Bolla's *wife* were the owners—but the evidence indicates Bolla was the principal figure directing WIN's activities, and Bolla's wife played a relatively minor role.  Moreover, ownership of WIN had little practical significance.  WIN had no capital assets; it was essentially an empty shell Radano and Bolla used to do business under a corporate name.  When money came into WIN, it was distributed to Bolla, Radano, and others with whom Bolla and Radano had fee-sharing agreements.  According to the Securities and Exchange Commission ("SEC"), Bolla designated his wife as co-owner of WIN (rather than himself), because Bolla was under SEC investigation.

Radano and Bolla's business involved locating investors and referring them to Lockwood Financial Services.  Lockwood

is a third-party administrator serving several well-regarded money managers. Lockwood acts as the intermediary between the money managers and investors. Specifically, Lockwood offers investors a service called a "wrap" account, which allows several investors to combine their funds to meet the high minimum-investment requirements of the money managers. Lockwood administers these accounts, but to attract investors, it relies primarily on referrals from investment advisers like WIN.

According to Lockwood's business model, the investment adviser determines the individual investor's specific investment priorities and directs the investor to the Lockwood money managers best suited to the investor's objectives. The investor then enters into a direct contractual relationship with Lockwood, and Lockwood begins paying fees to the investment adviser. Fees are generally calculated as a percentage of the total assets the investor places in Lockwood's control, and they are deducted directly from the investor's investment account. Investment advisers are also obligated to remain in regular contact with the investor and to monitor the investor's account, ensuring the investor's portfolio remains consistent with his or her investment objectives. Lockwood continues paying quarterly fees to the investment adviser from the investor's account as long as the investor has assets under Lockwood management.

Bolla and Radano received fees attributable to the assets each respectively had brought to Lockwood, though it appears Radano trusted Bolla to make the division. Over the course of several years, Bolla channeled $30-40 million in assets to Lockwood, and by the summer of 2000, he was receiving about $150,000 per year in fees. Radano had brought much less money to Lockwood, and his fee-sharing arrangements with third parties were not as favorable to him. Therefore, he

received only about $10,000 per year in fees.

Bolla personally handled most of WIN's financial affairs. For example, though WIN was listed as the investment adviser in Lockwood's records, when Lockwood paid fees to WIN, it mailed the check to Bolla, and Bolla deposited the fees in an account under his exclusive control, opened under the name "Steve M. Bolla DBA Washington Investment Network." Bolla would then disburse funds from this personal account to pay Radano his portion of the fees, with Bolla making the fee-split determination unilaterally. Bolla used the same account to pay many of his personal obligations including his mortgage and his wife's credit card.

On March 20, 2000, Bolla entered into a settlement with the SEC in regard to the ongoing investigation, not related to WIN or Radano; he signed a consent to entry of a judgment against him. On June 19, 2000, the federal district court entered a judgment in that unrelated case, enjoining Bolla from violating certain securities laws. The next day, the SEC issued an order barring Bolla from the investment advisory business. During the months leading up to this bar order, Radano knew it was likely and did nothing to disassociate himself (and WIN) from Bolla.

When the bar order issued in June of 2000, Radano learned of it almost immediately and contacted Lockwood within a month or two to report the change in circumstances and to establish himself as the new recipient of WIN fee payments (for both his own and Bolla's clients at WIN). Radano apparently hoped to take over some (if not all) of Bolla's lucrative book of business, but because Lockwood had Bolla listed as the "rep" for all WIN accounts, it refused to accept Radano as the new WIN representative without written letters of authorization from each individual investor. Radano testified this impasse with Lockwood came as a complete surprise to him. He expected

Lockwood to switch the WIN accounts to his name on the basis of a simple telephone call, and he thought little more was necessary to disassociate both himself and WIN from Bolla.

Radano got letters of authorization from his own clients, but he had a much harder time getting letters from Bolla's clients, in part because he lacked the necessary contact information. Eventually he succeeded, at least with some of Bolla's clients, and he established himself as the "rep" for WIN accounts. Because of the delay, Lockwood continued to send WIN's quarterly fee payments to Bolla for at least two quarters after the June 20, 2000 bar order. Bolla did not forward these fee payments unopened to Radano, thereby distancing himself from WIN and the investment advisory business; instead, Bolla continued to manage WIN's financial affairs, depositing the fee payments in his personal account, paying WIN's expenses, and disbursing a portion of the fees to Radano. In addition, Bolla refused to transfer control over the bank account to Radano, and he continued to give investment advice to WIN clients.

During this period, Radano continued to consult Bolla about WIN's affairs. For example, Radano sought Bolla's assistance in persuading Lockwood to transfer the WIN accounts to Radano's control. In addition, when Bolla's clients continued to call Bolla seeking investment advice, Bolla contacted Radano and in some cases gave instructions as to the needs of these clients. Bolla characterized these contacts as merely a matter of handing off these calls to Radano, but Bolla also instructed Radano about the payment of certain WIN expenses, instructions Radano then followed. Most important, when Radano began receiving WIN fee payments from Lockwood, he forwarded a portion of one of the fee payments (roughly $2,700) to Bolla's wife. This payment, which Radano made eight months after the bar order, was exactly fifty percent of the investment adviser fees attributable to each of several clients

during the previous quarter, many of whom were formerly Bolla's clients. Radano characterized this payment as an appropriate payment of investment adviser fees to Bolla's wife who was herself an investment advisor, but he conceded she performed only clerical duties for WIN and had not previously received fee payments for her services. Bolla did not suggest the payment was for services his wife had provided; rather, he asserted it was a reimbursement *to him* for accumulated expenses he had incurred over several years, including moving expenses. Bolla also said the payment was a fair settlement—a "cleaning up"—of what was owing to him: "I built a company . . . I think that WIN owed me that."

During the months after the bar order, Radano was evasive in some conversations with Bolla's clients, avoiding specific descriptions of Bolla's situation. Radano did not always make clear the SEC had barred Bolla from the investment advisory business, instead making vague comments that Bolla "was no longer with WIN," "was out of the business," or was "going to pursue more of the insurance angle." When one of these clients specifically asked about the bar order (having learned of it from an independent source), Radano downplayed the significance of the order, saying it related to a bankrupt company in California and had nothing to do with WIN.

II

The SEC brought this action against Bolla, Bolla's wife, Radano, and WIN, asserting Bolla continued to act as an investment adviser after he was barred from the investment advisory business and did so in association with WIN and Radano. Bolla and his wife settled, and the matter proceeded to a bench trial against WIN and Radano. The SEC asserted WIN violated sections 203(f), 206(1), and 206(2) of the Act by allowing Bolla to continue to associate with the firm and failing

to disclose Bolla's bar, and it asserted Radano aided and abetted those violations. Section 203(f) of the Act prohibits investment advisers from associating with parties they know to have been barred from the investment advisory business. 15 U.S.C. § 80b-3(f). Sections 206(1) and 206(2) prohibit investment advisers from "defraud[ing] any client or prospective client," *id.* § 80b-6(1), or "engag[ing] in any . . . practice . . . which operates as a fraud or deceit," *id.* § 80b-6(2).

The district court made findings of fact substantially consistent with the summary of evidence related above; however, the court expressly found Radano's testimony lacked credibility, and the court even found Radano fabricated evidence in support of his claim he severed ties between WIN and Bolla's wife in July 2000. The district court sustained the SEC's charges and issued an injunction barring WIN and Radano from future violations of sections 203(f), 206(1), and 206(2) of the Act. It also imposed a penalty of $15,000 against Radano and $50,000 against WIN. *SEC v. Bolla*, 401 F. Supp. 2d 43, 75 (D.D.C. 2005).

III

A

"In all actions tried upon the facts without a jury . . . [the trial court's f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." FED. R. CIV. P. 52(a). To satisfy this standard the district court's findings need only be plausible. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985). The district court's conclusions of law are subject to de novo review. *United States v. Microsoft Corp.*, 253 F.3d 34, 50-51 (D.C. Cir. 2001). We

review the decision to grant an injunction for abuse of discretion. *SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000).

B

Appellants first argue WIN was not an investment adviser as that term is defined in section 202(a)(11) of the Act. As relevant here, section 202(a)(11) defines "[i]nvestment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b-2(a)(11). Appellants contend WIN acted primarily as a referral service for Lockwood, receiving what amounted to a finder's fee, and they minimize any role WIN played in giving investment advice. This claim, however, is refuted by the evidence, including Radano's own testimony, which shows WIN had an obligation to advise new clients regarding various investment options and a continuing obligation to monitor each client's investment account. For example, Radano testified WIN's continuing duties after a client had set up an account with Lockwood included "[e]nsuring that . . . the integrity of the account remained," "ensur[ing] that the account . . . was still consistent with risk parameters, goals and objectives," and "mak[ing] sure [the account] was on track and consistent." Radano further testified the quarterly fee payments WIN received were in exchange for these ongoing account monitoring obligations. At his deposition, which the district court also considered in making its findings, Radano specified that, if a client's account ceased to be consistent with the client's needs, "[c]hanges would be made in terms of management, in terms of allocation between stock and bond." Moreover, Radano executed WIN's March 22, 2000 application

to the State of Connecticut for an "investment adviser registration." In that application, WIN stated it "reviewed [client statements] monthly for accuracy" and completed client profiles "annually to allow account objectives to adjust to any changes in client goals or risk tolerances." WIN also stated its fee was "[f]or overall portfolio management, portfolio allocation, manager selection and personalized account services." Finally, WIN described its business as follows:

> Applicant offers advice to clients about other outside unaffil[i]ated investment advisors through a wrap account program. Applicant develops a detailed investment profile about each client prior to manager selection. Applicant's advice to clients consists of asset allocation and assistance in the selection of investment managers for account assets. . . . Applicant monitors all selected investment managers on an ongoing basis for investment returns, sector analysis, investment process and investment objectives.

All of this evidence leaves no doubt WIN had an ongoing obligation to give investment advice and did not merely act as a referral service.

Because WIN's business entailed advising clients in choosing among different investment managers who had distinct investment styles, and because it also advised clients in regard to "asset allocation," we think WIN's activities easily fall within the Act's definition of investment adviser. As the district court found, WIN's business of selecting particular investment managers in lieu of others had the effect of channeling client funds to particular security investments. Indeed, if this were not so, then there would have been no point in making "[c]hanges . . . in terms of management" and "allocation" when an account ceased to be consistent with a client's needs. In short, we cannot say the district court's factual conclusions were

"clearly erroneous," FED. R. CIV. P. 52(a), and we agree with the district court that WIN's service constituted "advising others . . . as to the advisability of investing in, purchasing, or selling securities," 15 U.S.C. § 80b-2(a)(11), making WIN an investment adviser.

C

Appellants deny WIN violated section 203(f) of the Act. As noted, that section prohibits investment advisers from associating with parties they know have been barred from the investment advisory business. *Id.* § 80b-3(f). Specifically, section 203(f) provides: "[I]t shall be unlawful for any investment adviser to *permit* [any person as to whom a bar order is in effect] to become, or remain, a person associated with him . . . if such investment adviser knew, or in the exercise of reasonable care, should have known, of such order." *Id.* (emphasis added). Section 202(a)(17) provides in relevant part: "The term 'person associated with an investment adviser' means any partner, officer, or director of such investment adviser (or any person performing similar functions), *or any person directly or indirectly controlling* or controlled by such investment adviser, including any employee of such investment adviser . . . ." *Id.* § 80b-2(a)(17) (emphasis added).

The record makes clear, as the district court found, that Bolla continued to manage WIN's finances after the bar order. When Bolla received fee checks from Lockwood—checks that belonged to WIN—he did not forward those checks unopened to Radano; instead, he deposited the fees in his personal account, paid WIN's expenses, and disbursed a portion of the fees to Radano. He even claimed, according to Radano's testimony, that September 30, 2000 (three months *after* the bar order) was a "good break point"—a good time, that is, for Radano to take over the finances at WIN. In addition, Bolla refused to transfer

control over WIN's bank account to Radano, and Bolla continued to receive inquiries from WIN clients and direct Radano as to the needs of these clients. Radano, for example, testified Bolla "was calling me and saying client A, B, C call[,] client so and so call. . . . He would call me and say . . . Tim[] Riordan . . . called; Daniel Davon needs [an] IRA distribution, call him." Bolla also specifically instructed Radano concerning the payment of WIN's obligations in accordance with certain third-party fee-sharing agreements. At trial, Radano was asked: "[Y]ou're still [on November 27, 2000] taking instructions from [Bolla] on how to subdivide fees?" To which, Radano replied: "On some level, yes, ma'am, because he's received . . . this check directly from Lockwood, so what I'm trying to do is make sure that the fees are properly processed through the system." Similarly, Radano testified about a check he had received from Bolla after the bar order:

> This was a check that was sent out to me so that I could send a client— . . . I don't have a direct recollection as to why [Bolla] sent it to me to send out to other people, but . . . there's a . . . deposit into the WIN . . . .
> [T]hen I paid out—for whatever reason, he wanted me to pay out, or requested that I pay someone else out fees at that time."

To clarify that response, counsel asked: "[Bolla] directed you to make payments to third parties?" To which, Radano replied: "Yes."

Furthermore, the evidence easily supports the district court's finding that the $2,700 payment WIN made to Bolla's wife in February 2001 was a division of fees between Radano and Bolla for the previous quarter, and this division of fees was made at the direction of Bolla himself. This payment was exactly fifty percent of the fees attributable to several WIN

clients, most of whom were Bolla's former clients, and Bolla's testimony indicated the payment was really to him, and not to his wife. If the payment were merely a reimbursement of expenses Bolla incurred before the bar order, as Bolla suggested, it would probably not constitute "associat[ion]" in violation of section 203(f), but the evidence supports the district court's finding that the payment was actually a division of fees for a quarter that post-dated the bar order. Moreover, Radano's characterization of this payment as a fee payment to Bolla's wife has no credibility at all in light of her limited duties at WIN and the fact that she had never previously received payment.

This evidence makes very clear Bolla continued to be a "person directly or indirectly controlling" WIN after the bar order, *id.* § 80b-2(a)(17), and therefore the district court's conclusion that Bolla remained associated with WIN is not clearly erroneous, FED. R. CIV. P. 52(a).

However, evidence showing Bolla continued his WIN-related activities after the June 20, 2000 bar order is insufficient, by itself, to warrant a judgment against WIN and Radano. If, for example, Bolla stole fee checks that properly belonged to WIN and disbursed funds from those checks in contravention of WIN's wishes and despite WIN's active efforts to prevent Bolla's actions, then WIN could not be held liable for violating section 203(f), because WIN would not in that case have "permit[ted]" Bolla to remain associated with WIN. 15 U.S.C. § 80b-3(f). WIN would then be a *victim* of Bolla, not an *associate*. Therefore, to establish a violation of section 203(f), the SEC needed to prove WIN took some affirmative step to permit Bolla to associate with WIN, or at least that it acquiesced in Bolla's ongoing management of WIN finances such that its passivity can be deemed a violation of section 203(f). The latter possibility is significant here. Appellants argue the term "permit" in section 203(f) means "authorize," which suggests an

affirmative giving of permission, as when a regulatory agency issues a license allowing a private party to engage in a regulated activity. The SEC rejects this narrow reading of the word "permit," interpreting the word to mean, in effect, "acquiesce." We think the SEC's reading of the statute is correct. If Congress in adopting section 203(f) used the word "permit" to mean "authorize," the statute would be so narrow in scope as to be almost silly. It is hard to imagine an investment adviser ever actively authorizing a barred individual to take control of the firm. The much more natural reading of the statute is that it prohibits investment advisers from standing aside passively while a barred individual takes control of the firm, and this is the reading we adopt. In sum, we need to consider whether WIN acquiesced in Bolla's continuing control over its finances to a degree sufficient to hold it liable under section 203(f).

As a corporation, WIN could only act through its officers, and with the exception of Bolla himself, WIN's only corporate officers were Radano and Bolla's wife. Because Bolla's wife did not act in an executive capacity at WIN (as all parties concede), the focus is on Radano's actions as managing director of WIN during the months leading up to and immediately following the bar order.

Radano testified in essence that he was blind-sided by the June 20, 2000 bar order, and he immediately took action to sever ties between WIN and Bolla, but he did not gain full control of WIN's finances for several months. Bolla, however, settled with the SEC in March 2000, and Radano knew of Bolla's problems with the SEC long before that settlement. Moreover, Radano conceded he knew in February of 2000 that Bolla was likely to be barred soon; he just did not know precisely when the bar would take effect. Radano further claims that, in his ignorance, he thought a mere telephone call to Lockwood would cause Lockwood to change the address on the WIN accounts to

Radano's address, and with that change of address, the necessary transition would be complete. But even if we assume Radano was completely ignorant of WIN's contractual relationship with Lockwood, Radano could not very well expect to take over Bolla's WIN clients with neither a formal introduction to these clients nor records of their investment history or objectives, which remained in Bolla's possession. Moreover, assuming Radano could convince these clients to remain with WIN, he could not hope to take over Bolla's side of the business without knowledge of Bolla's fee-sharing arrangements with third parties. Therefore, even if we accept Radano's claim, Radano had no basis for expecting to take over control of WIN without Bolla's cooperation. Under these circumstances, Radano's casual, "wait and see" approach was simply inadequate. As soon as Radano knew the bar order was imminent, Radano, as WIN's managing director, should have actively sought Bolla's cooperation with the transition of Bolla's WIN clients to Radano's oversight, and if that cooperation was not forthcoming, Radano should have taken steps to protect WIN and its clients.

Radano's failure in this regard might be dismissed as mere managerial incompetence. It rose to the level of a violation of section 203(f) once the bar order took effect and Radano still took no steps on behalf of WIN to prevent Bolla's continuing control over WIN and its finances. Because Bolla had, prior to the bar order, held himself out as one of WIN's managing directors, WIN needed to take immediate steps to terminate its relationship with Bolla. Radano's actions as the managing director of WIN make clear WIN did not. Radano failed to notify the SEC that Bolla was insisting on continuing his role as manager of WIN's finances despite the bar order. Radano also did not bring any legal action against Bolla on behalf of WIN, and in fact, Radano did not even formally protest to Bolla in writing concerning Bolla's continuing involvement with WIN.

Rather, Radano was complicit in the arrangement, treating it as part of a necessary transition, and even going so far as to make a fee payment to Bolla on behalf of WIN.

Finally, Radano did not take formal steps on behalf of WIN to inform WIN's clients of the bar order, along with an explanation of how the bar order might affect their interests and a neutral discussion of the options these clients might have. Such a formal notification would likely have caused WIN's clients either (1) to terminate their relationship with WIN, or (2) to execute letters of authorization making Radano their selected representative at Lockwood. In either case, notification would have made clear WIN was not complicit in Bolla's ongoing involvement with WIN's financial affairs, and it would have satisfied WIN's fiduciary obligations to its clients. Radano testified he could not contact Bolla's WIN clients because Bolla possessed the contact information for these clients. But this assertion does not excuse Radano's failure to take immediate action, as WIN's managing director, to protect WIN's interests. If Bolla was refusing to release WIN's client files and related records, then Radano needed to initiate legal proceedings on WIN's behalf to obtain those files. By not doing so, he signaled that WIN was content to allow Bolla to continue in his traditional role as WIN's principal. Moreover, even when Bolla's former clients contacted Radano, he still did not make clear the SEC had barred Bolla from the investment advisory business. Instead, he resorted to dodgy statements that obscured the truth. WIN's failure to notify its clients indicates, as the district court found, that "Radano chose the lure of . . . potential profit from Bolla's book of clients over his obligations under Section 203(f)."

In sum, the district court found Radano took no significant actions on behalf of WIN to sever ties with Bolla during the months following the bar order. Radano knew Bolla continued

to serve as the contact person for his clients, and he also knew Bolla continued to manage WIN's finances. He followed Bolla's instructions in regard to the disbursement of WIN's fees, and eight months after the bar order, he paid Bolla a portion of WIN's fees, at Bolla's behest. Finally, he failed to inform WIN's clients of the bar order. In light of the evidence, these findings are not "clearly erroneous," FED. R. CIV. P. 52(a), and they amply support the district court's conclusion that WIN permitted Bolla's continued association with the firm in violation of section 203(f).

D

Appellants also deny WIN violated section 206 of the Act. Section 206 provides in relevant part: "It shall be unlawful for any investment adviser . . . directly or indirectly—(1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . ." 15 U.S.C. § 80b-6. The district court found WIN violated both subparagraph (1) and subparagraph (2) of section 206 when Radano, as a representative of WIN, spoke to Bolla's former clients without disclosing the bar order. In the district court's view, Radano hoped to attract these clients to himself, and therefore he did not want to say anything that would cause these clients to sever their relationship with WIN. Appellants raise several objections to the district court's decision.

First, appellants argue that, with few exceptions, a failure to disclose cannot constitute a fraud in violation of section 206. Appellants base this argument on the absence from section 206 of a failure-to-disclose provision that is included in section 17(a) of the Securities Act of 1933. *Id.* § 77q(a). Section 17(a) of the Securities Act has two subparagraphs that are almost identical

to the first two subparagraphs of section 206, but section 17(a) includes a third subparagraph that makes it unlawful "to obtain money or property by means of . . . any *omission* to state a material fact" when omitting the fact is "misleading." *Id.* § 77q(a)(2) (emphasis added). Appellants argue the absence of this provision from the Investment Advisers Act suggests the Act was not intended to cover inadequate disclosure of material information, but only actual misrepresentations of fact and other affirmative frauds.

In response, the SEC argues the two statutory schemes cannot be compared. The Investment Advisers Act concerns itself with investment advisers, who, as fiduciaries, have a duty to disclose material information to clients. Because the Securities Act applies to non-fiduciaries as well as fiduciaries, it is more specific as regards the implications of failing to disclose material information.

The SEC also relies on *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180 (1963), in which the Supreme Court made clear the failure to disclose material information can, in at least some circumstances, provide the basis for a fraud finding under section 206. *Capital Gains* considered whether an investment adviser had a duty to disclose a practice known as "scalping." *Id.* at 181. Scalping occurs when an investment adviser purchases shares of a security for his own account prior to recommending the security for longterm investment and then immediately sells the shares after a rise in the market price following the recommendation. *Id.* The Supreme Court held section 206 requires investment advisers to disclose this practice. *Id.* at 181-82. Appellants argue *Capital Gains* is distinguishable factually, pointing out that *Capital Gains* (unlike the present case) involved multiple securities transactions made against a background of nondisclosure. Be that as it may, we think the better reading of section 206 is that it prohibits failures

to disclose material information, not just affirmative frauds. This reading is consistent with the fiduciary status of investment advisers in relation to their clients, *id.* at 191-92, 194, and it is also more likely to fulfill Congress's general policy of promoting "full disclosure" in the securities industry, *id.* at 186.

The district court found Radano, as WIN's representative, was evasive in conversations with at least two of WIN's clients during the months following the bar order, thereby violating section 206.  Radano did not disclose the bar order to these clients, choosing instead to offer vague comments about Bolla's status and then only after these clients pressed for information. When one of these clients directly confronted Radano about the bar order, he downplayed its significance.  In this way, the court found "Radano affirmatively misled [these clients] regarding Mr. Bolla" and provided these clients "an inaccurate, skewed version of WIN as an investment entity."  The district court's findings in this regard are supported by the clients' testimony, which the court found more credible than Radano's own testimony, and therefore these findings are not "clearly erroneous."  FED. R. CIV. P. 52(a).

Moreover, we agree with the district court that WIN's evasiveness in these conversations constituted fraudulent behavior in violation of section 206.  In *Capital Gains*, the Supreme Court noted that investment advisers, as fiduciaries, have "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading [their] clients." 375 U.S. at 194 (citations and internal quotation marks omitted).  Certainly, in WIN's case, this duty included disclosing Bolla's bar from the investment advisory business. Bolla was not an incidental player in WIN's business.  His clients at WIN represented WIN's largest accounts, and his corresponding share of WIN's fees dwarfed that of Radano, who

was WIN's only other active investment adviser. Moreover, he personally managed WIN's finances, and for many of WIN's clients, he was the face of WIN. When such a critical player in an investment advisory firm is barred from the business on account of misconduct, the firm has a fiduciary duty to disclose that fact to its clients, and in particular to clients who previously dealt exclusively with that individual.

Appellants assert Radano's communications with WIN's clients were not misleading, or if they were, they did not rise to the level of fraud. The SEC's evidence, appellants point out, focused primarily on conversations Radano had with only two clients. The SEC did not establish either client lost money as a result of Radano's evasiveness during these conversations, and in one of the conversations, the client already knew about the bar order. Therefore, appellants assert, Radano's failure to disclose the bar order could not constitute fraud.

To obtain an injunction under section 206 against fraudulent conduct, the SEC does not need to prove reliance on the investment adviser's misleading statements, nor does the SEC need to prove injury. *Id.* at 192-93, 195. Rather, if an investment adviser is likely to repeat fraudulent conduct and future injury is reasonably foreseeable, an injunction may issue as a prophylactic measure without the necessity of waiting until the injury actually occurs. *Id.* Hence, we reject appellants' contention that the failure of the SEC to establish injury requires reversal here.

Appellants also argue the bar order was a matter of public record and therefore disclosure of the bar order was unnecessary. Appellants rely on *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004), in which the Fifth Circuit found the public availability of information relevant in a failure-to-disclose case. We agree the public availability of information

is a relevant consideration when evaluating a party's disclosure obligations under the securities laws, but we do not think this principle requires reversal here. The existence of the bar order may have been public information, but it was not information that was so widely disseminated that an average small investor could be expected to be aware of it.

Finally, appellants deny Radano acted with the requisite "intent to deceive, manipulate, or defraud," *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)), when he failed to disclose the bar order to WIN's clients, and therefore argue WIN cannot be held liable for violating section 206(1). Similarly, appellants deny Radano acted with the negligence required to make out a violation of section 206(2). *See id.* at 643. The district court made an express finding of intent to defraud, as well as negligence, stating that Radano, in his dealings with WIN's clients, "opted to pursue the potential financial gain resulting from easy transfers of accounts over the hard acknowledgment that his business partner had been barred from further practice by the regulating agency." The court also rejected appellants' argument that Radano's quick action in informing Lockwood about the bar order established his good faith. As the court saw it, "Mr. Radano immediately notified Lockwood of Mr. Bolla's bar . . . because it was in his economic interest to separate Mr. Bolla from Lockwood as soon as possible. In contrast, . . . Mr. Radano was reticent and reserved [with WIN's clients] . . . in an effort to maintain their association with WIN . . . ." In short, the district court found Radano, driven by self-interest, intentionally breached his fiduciary obligations and those of WIN, "well aware that he could potentially increase his salary fifteen-fold" by taking over Bolla's accounts.

The district court's findings are amply supported by the

testimony of WIN's clients, who described their conversations with Radano and whom the court found to be more credible than Radano. We also agree with the district court that Radano's denial of any intent to be evasive in conversations with WIN's clients is highly doubtful in light of his openness and candor in situations where such candor served his personal interest—to wit, with Lockwood. The district court's findings of both intent and negligence are not "clearly erroneous." FED. R. CIV. P. 52(a).

E

The district court held Radano liable on an aider and abettor theory, while holding WIN liable as the principal violator. Radano argues the court's findings are insufficient to support aider and abettor liability, because the court made no express finding that he had "knowledge of wrongdoing." *See Howard v. SEC*, 376 F.3d 1136, 1142-43 (D.C. Cir. 2004).

To be liable as an aider and abettor under sections 203(f), 206(1), and 206(2), the SEC must prove "knowledge of wrongdoing," *id.*, or "a general awareness [on the part of the alleged aider and abettor] that his role was part of an overall activity that was improper," *Investors Research Corp. v. SEC*, 628 F.2d 168, 178 (D.C. Cir. 1980). With respect to WIN's violation of section 203(f), Radano admits he knew of the bar order, having learned of it almost immediately after it went into effect. Certainly, then, he knew it was improper for WIN to continue associating with Bolla, and the district court found WIN continued to associate with Bolla in several ways, including: (1) permitting Bolla to control its finances; (2) complying with Bolla's instructions regarding payment of its obligations; (3) paying Bolla a portion of its fees, at Bolla's behest; and (4) failing to inform its clients about the bar order. Moreover, in each instance, WIN acted under Radano's

direction. Though the district court did not make an express finding that Radano knew the wrongfulness of WIN's actions—that is, that they constituted improper association—the court made such a finding implicitly. We think the record as a whole indicates Radano, as WIN's agent, was "general[ly] aware[] that his role was part of an overall activity that was improper," *id.*, and therefore the record adequately supports the district court's holding that he aided and abetted WIN's violation of section 203(f).

With respect to WIN's violation of section 206, we think an express finding that Radano had knowledge of WIN's wrongdoing was unnecessary because this question was subsumed within the question whether WIN acted with the requisite scienter. As noted, a violation of section 206(1) requires proof of "intent to deceive, manipulate, or defraud." *Steadman*, 967 F.2d at 641 (quoting *Hochfelder*, 425 U.S. at 194 n.12). The district court found WIN had acted with such intent based solely on Radano's motives as WIN's managing director. In a situation like that presented here, where a small firm, acting solely through the agency of a single individual, has intentionally deceived, manipulated, or defrauded its clients, the conclusion is unavoidable that the individual in question has knowledge of the firm's wrongdoing.

F

Appellants argue this case did not involve the sort of repeated violations and likelihood of future violations that warrant injunctive relief. *See Steadman*, 967 F.2d at 647-48. We conclude the record adequately supports the district court's finding of a reasonable likelihood of future violations, and the court therefore acted within the bounds of its discretion in entering the injunction. Significantly, we are not presented here with an isolated event or a violation that is technical in nature.

Radano's willingness to enter into a business relationship with Bolla though he knew the SEC was likely to bar Bolla from the investment advisory industry, his failure to take decisive action to distance himself and WIN from Bolla once the bar order became imminent, his willingness to permit Bolla to continue his control over WIN's finances after the bar order took effect, his payment of fees to Bolla eight months after the bar order, and his lack of candor in conversations with WIN's clients (thereby putting his self-interest over that of the clients), all strongly suggest a willfulness and a continuing pattern of fiduciary violations that is likely to be repeated in the future. Therefore, we uphold the injunction. However, we find the injunction insufficiently specific.

Rule 65(d) of the Federal Rules of Civil Procedure provides: "Every order granting an injunction . . . shall be specific in terms [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . . ." The district court's injunction states simply: "Defendants WIN and Radano are enjoined from future violations of Sections 203(f), 206(1), and 206(2) of the Advisers Act." We think this injunction fails to clarify "the act or acts sought to be restrained," FED. R. CIV. P. 65(d), and it might subject defendants to contempt for activities having no resemblance to the activities that led to the injunction, thereby being overly broad in its reach. *See SEC v. Savoy Indus., Inc.*, 665 F.2d 1310, 1318-19 (D.C. Cir. 1981). We therefore remand the case to the district court to reform the injunction and to address the question of overbreadth.

## G

The SEC's complaint sought penalties under section 20(d) of the Securities Act of 1933, 15 U.S.C. § 77t(d), and section 21(d)(3) of the Securities Exchange Act of 1934, *id.* § 78u(d)(3).

Appellants argue the district court erred in awarding penalties under these provisions. In addition, Radano argues the Investment Advisers Act does not authorize penalties against an aider and abettor, but only against "the person who committed [the] violation." *Id.* § 80b-9(e)(1). Appellants did not raise these issues before the district court, and therefore the issues are forfeit. *See*, *e.g.*, *Albrecht v. Comm. on Employment Benefits of the Fed. Reserve Employee Benefits Sys.*, 357 F.3d 62, 66 (D.C. Cir. 2004).

## IV

We affirm the district court's judgment finding WIN violated sections 203(f), 206(1), and 206(2) of the Investment Advisers Act of 1940 and finding Radano aided and abetted those violations. We also affirm the imposition of penalties on WIN and Radano, as set forth in the district court's judgment. We remand the case to the district court for it to amend the injunction to describe more specifically the act or acts sought to be restrained.

*So ordered.*